IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ILLINOIS BELL TELEPHONE COMPANY, ) </br> ) </br> ) </br> Plaintiff, ) </br> v. ) </br> ) </br> CHARLES E. BOX, ERIN M. O'CONNELL-DIAZ, ) </br> LULA M. FORD, ROBERT F. LIEBERMAN, and ) </br> KEVIN K. WRIGHT, in Their Official Capacities as ) </br> Commissioners of the Illinois Commerce ) </br> Commission and Not as Individuals, ) </br> ) </br> Defendants. ) </br> ) </br> and ) </br> ) </br> ACCESS ONE, INC., CIMCO ) </br> COMMUNICATIONS, INC., FORTE ) </br> COMMUNICATIONS, INC., and XO ) </br> COMMUNICATIONS SERVICES, INC. ) </br> ) </br> Intervenors/Defendants | Case No. 06 C 3550 </br></br> Judge Virginia M. Kendall |

**MEMORANDUM OPINION AND ORDER**

This action was filed by Illinois Bell Telephone Company ("AT&T")[1] seeking declaratory and injunctive relief under the Telecommunications Act of 1996 (the "Act"). AT&T brought this action against Charles E. Box, Erin M. O'Connell-Diaz, Lula M. Ford, Robert F. Lieberman, and Kevin K. Wright (the "Commissioners") to challenge determinations of the Illinois Commerce Commission ("ICC") as set forth in an arbitration order issued November 2, 2005 (the "Arbitration

---

[1] Illinois Bell Telephone Company does business as AT&T Illinois and was formerly known as SBC Illinois.

Decision").[2] Specifically, AT&T challenges the ICC's determinations that: (1) AT&T must make pieces of its telecommunications network known as "entrance facilities" available to competitors if they are used for the sole purpose of interconnection; and (2) the FCC's rules for certain loops – lines running from a customer location to a telecommunications carrier's switch – apply only to loops used to serve "mass market" customers.[3] AT&T seeks a declaration that the ICC's decisions violate federal law and seeks a permanent injunction preventing any of the defendants from enforcing any provision of the ICC's arbitration order that violates federal law. The matter is before this Court on AT&T's motion for summary judgment. For the reasons stated herein, AT&T's motion for summary judgment is granted in part and denied in part.

## BACKGROUND

**The Regulatory Framework.**

Until the 1990's, local telephone service was thought to be a natural monopoly. *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 371 (1999). However, in recognition of the fact that technological advances had presented the possibility of competition among providers of local telephone service, Congress passed the Telecommunications Act of 1996, 47 U.S.C. § 251, *et seq.* ("the Act"). *Verizon Communications, Inc. v. FCC*, 535 U.S. 467, 476 (2002). The Act "seeks primarily to promote competition in the previously monopoly-driven local telephone service market." *Indiana Bell Tel. Co., Inc. v. McCarty*, 362 F.3d 378, 382 (7th Cir. 2004) (citing *Verizon*,

---

[2]After AT&T filed this action, Access One, Inc., Cimco Communications, Inc., Forte Communications, Inc. and XO Communications Services, Inc. ("Intervenor CLECs," together with the Commissioners, "Defendants") intervened as defendants.

[3]AT&T also quarrels with the ICC's definition of the term "mass market" as including those customers that have fewer than 4 standard "DS0" lines.

535 U.S. at 475-76). To that end, the Act requires the former monopolists, incumbent local exchange carriers ("ILECs," here, AT&T), to allow new market entrants – competing local exchange carriers ("CLECs," here, the intervening defendants) – to interconnect with and access the incumbent's network at a fair price. *Id.* (citing 47 U.S.C. § 251(c)). "Congress recognized that without allowing new entrants to use the incumbents' local exchange networks and other technology and services, the incumbents would maintain a stranglehold on local telephone service: no new entrant could realistically afford to build from the ground up the massive communications grid the incumbents had developed through years of monopolistic advantage." *Id.* (citing *Verizon*, 535 U.S. at 490).

The Act gave the Federal Communications Commission (the "FCC") broad powers to require ILECs to make pieces of their networks available as "unbundled" building blocks – unbundled network elements ("UNEs") – which CLECs may lease, repackage, and use to compete against the ILECs in telecommunications markets across the country. *Covad Communications Co. v. FCC*, 450 F.3d 528, 531 (D.C. Cir. 2006). "Congress left to the Commission the choice of elements to be 'unbundled,' specifying that it must 'consider, *at a minimum*, whether [access to such network elements as are proprietary in nature is necessary; and] the failure to provide access to such network elements would *impair* the ability of the telecommunications carrier seeking access to provide the services that it seeks to offer.'" *Id.* at 531-32 (quoting 47 U.S.C. § 251(d)(2)) (emphases added by the *Covad* court).

Under the Act, CLECs must pay ILECs for each facility or piece of equipment that the ILEC requests from the CLEC on an unbundled basis. *Id.* at 532. The FCC has concluded that UNE prices are to be based upon each element's Total Element Long-Run Incremental Cost ("TELRIC"), which

is akin to a wholesale rate. *Id*. Given the lower price of UNEs, the CLECs favor widespread unbundling. Contrariwise, the ILECs favor fewer UNEs. Accordingly, the ILECs and CLECs have been engaged in a power struggle over UNEs since shortly after the passage of the Act. *Id.* at 533.

The FCC three times unsuccessfully undertook to implement the unbundling provisions in section 251 of the Act. The FCC's first attempt – the *Local Competition Order* – very broadly interpreted the section 251(d)(2)(B) impairment standard governing the ILECs' unbundling obligations. *See In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 F.C.C.R. 15499 (1996) ("Local Competition Order" or "LCO"). The Supreme Court vacated the LCO, finding that "the [FCC's] assumption that *any* increase in cost (or decrease in quality) imposed by denial of a network element renders access to that element 'necessary,' and causes the failure to provide that element to 'impair' the entrant's ability to furnish its desired services, is simply not in accord with the ordinary and fair meaning of those terms." *Iowa Utilities Bd.*, 525 U.S. at 389-90. The Court agreed with ILECs that "the Act requires the FCC to apply *some* limiting standard, rationally related to the goals of the Act, which it has simply failed to do." *Id.* at 388. The Court concluded that "if Congress had wanted to give blanket access to incumbents' networks on a basis as unrestricted as the scheme the [FCC] has come up with, it would not have included § 251(d)(2) in the statute at all. It would simply have said (as the Commission in effect has) that whatever requested element can be provided must be provided." *Id.* at 390.

In response to the Supreme Court's decision in *Iowa Utilities Board*, the FCC issued the *UNE Remand Order*, in which it adopted narrower requirements for determining the UNEs that ILECs must provide pursuant to the "necessary" and "impair" standards. The FCC adopted a new definition

4

of what constitutes "impairment" under section 251(d)(2)(B), stating that an ILEC's failure to provide access to a network element impairs a requesting CLEC if, taking into consideration the availability of alternative elements outside the ILEC's network, lack of access to the element in question materially diminishes a requesting CLEC's ability to provide the services it seeks to offer. *See UNE Remand Order*, 15 F.C.C.R. 3696, 3725. Applying that standard, the FCC set forth a list of network elements that must be unbundled in all markets and pledged, in light of the rapid changes in technology and competition, to reexamine the national list of UNEs in three years.

The United States Court of Appeals for the District of Columbia Circuit found the impairment standard articulated in the *UNE Remand Order* to be unlawful because it did not differentiate between those cost disparities that a new entrant in any market might likely face and those that arise from market characteristics "linked (in some degree) to natural monopoly . . . that would make genuinely competitive provision of an element's function wasteful." *Covad*, 450 F.3d at 533 (citing *United States Telecom Ass'n v. FCC*, 290 F.3d 415, 427 (D.C. Cir. 2002) ("*USTA I*")). "*USTA I* concluded that the FCC's broad concept of impairment failed to 'balance' the costs and benefits of unbundling . . . [and instructed the FCC] to make nuanced impairment determinations." *Id. USTA I* held that the Act does not require the FCC to make unbundling determinations on a market-by-market basis, but that it does require "a more nuanced concept of impairment than is reflected in findings . . . detached from any specific markets or market categories." *Id.* (quoting *USTA I*, 290 F.3d at 426).

On remand from *USTA I*, the FCC again refined its impairment standard and revised its list of UNE's that ILECs must provide to requesting carriers. The FCC's refined standard provided that a CLEC would be impaired when "a lack of access to an incumbent LEC network element poses a

barrier or barriers to entry, including operational and economic barriers, that are likely to make entry into a market uneconomic." *In re Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 18 F.C.C.R. 16978, 17035 (2003) ("Triennial Review Order" or "TRO"). The United States Court of Appeals for the District of Columbia Circuit subsequently invalidated much of the TRO. *See United States Telecom Ass'n v. FCC*, 359 F.3d 554, 576 (D.C. Cir. 2004) ("*USTA II*"). The court concluded that the FCC's "'touchstone' of impairment – 'uneconomic' entry – was excessively vague." *Covad*, 450 F.3d at 534. The court also rejected the FCC's attempt to delegate power to state regulatory commissions to make impairment determinations. *USTA II*, 359 F.3d at 565-66. Instead, the court held that "the FCC must establish unbundling criteria that take into account relevant market characteristics, which capture significant variation, sensibly define the relevant markets, connect those markets to the FCC's impairment findings, and consider whether the element in question is significantly deployed on a competitive basis." *Covad*, 450 F.3d at 534 (citing *USTA II*) (internal citations and quotations omitted). "The fact that CLECs can viably compete without UNEs . . . precludes a finding that the CLECs are impaired by lack of access to the element under § 251(c)(3)." *Id.* (citing *USTA II*) (internal citations and quotations omitted).

On remand from *USTA II*, the FCC issued an interim order and notice of proposed rulemaking and then, after receiving and considering comments, issued a four-part order that, among other things, clarified that impairment would be found where it would be uneconomic for a "reasonably efficient" CLEC to compete without UNEs. *Id.* at 534-35 (citing *In re Unbundled Access to Network Elements, Order on Remand*, 20 F.C.C.R. 2553, 2547-49 (2005) ("Triennial Review Remand Order" or "TRRO"). The TRRO – representing the FCC's fourth and final set of unbundling rules – was upheld on appeal to the D.C. Circuit. *See id.*

**Procedural History.**

The interconnection obligations imposed by the Act are implemented through "interconnection agreements" between ILECs and CLECs. *See* 47 U.S.C. § 252. The Act requires ILECs and CLECs to negotiate the terms of such interconnection agreements in good faith to fulfill the duties described in Sections 251(b) and (c). *See id.*; 47 U.S.C. § 251(c)(1). In the event that negotiations are not successful, either the ILEC or the CLEC may petition the appropriate state public utility commission – in this case, the ICC – to arbitrate "any open issues" that the parties have not been able to resolve through negotiation. 47 U.S.C. § 252(b)(1). The state commission charged with resolving open issues via arbitration must "ensure that such resolution and conditions meet the requirements of section 251 of [the Act], including the regulations prescribed by the [FCC] pursuant to section 251." 47 U.S.C. § 252(c).

Both the TRO and the TRRO called for ILECs and CLECs to implement the FCC's rules changes through the negotiation and arbitration of amendments to their interconnection agreements. *See, e.g.*, TRRO ¶ 233 ("carriers must implement changes to their interconnection agreements consistent with our conclusions in this Order. . . . the [ILECs] and [CLECs] must negotiate in good faith regarding any rates, terms, and conditions necessary to implement our rule changes"). After engaging in negotiations, the parties in this case petitioned the ICC to resolve certain issues with respect to which they could not reach agreement. The ICC issued its Arbitration Decision on November 2, 2005. Thereafter, AT&T filed the instant action challenging two aspects of the ICC's November 2, 2005 order: (1) the ICC's determination that AT&T must make "entrance facilities" available to competitors if they are used for the sole purpose of interconnection; and (2) the ICC's

determination that the FCC's rules for certain loops apply only to loops used to serve "mass market" customers.

## STANDARD OF REVIEW

Because this is an administrative appeal, this Court sits as an appellate tribunal reviewing the decision of the ICC, rather than performing its traditional role as a trial court. *Sw. Bell Tel., L.P. v. Missouri Pub. Serv. Comm'n*, 461 F. Supp.2d 1055, 1065 n.9 (E.D. Mo. 2006) (citing *Optimal Data Corp. v. United States*, 17 Cl. Ct. 723, 727 (1989)). In reviewing the Arbitration Decision, this Court's "sole responsibility is to determine whether the interconnection agreement meets the requirements of sections 251 and 252 of the Act." *McCarty*, 362 F.3d at 383 (citing 47 U.S.C. § 252(e)(6)). The Seventh Circuit has held that section 252(e)(6) provides for judicial review of state commission *actions*; as such, the scope of this Court's review extends to whether the Arbitration Decision departs from federal law and is not limited to the mere approval or rejection of the interconnection agreement at issue. *Illinois Bell Tel. Co. v. Worldcom Tech., Inc.*, 1999 U.S. App. LEXIS 20635, *1 (7th Cir. Aug. 19, 1999); *accord Sw. Bell Tel. Co. v. Pub. Util. Comm'n*, 208 F.3d 475, 481 (5th Cir. 2000). This Court's review of the ICC's interpretation of federal law is *de novo*. *McCarty*, 362 F.3d at 385. With respect to the ICC's factual determinations and mixed questions of law and fact, however, this Court applies a deferential "arbitrary and capricious" review standard. *Illinois Bell Tel. Co. v. Wright*, 245 F. Supp.2d 900, 905 (N.D. Ill. 2003) (citing *U.S. West Communications, Inc. v. Hix*, 986 F. Supp. 13, 18 (D. Colo. 1997)); *accord Missouri Pub. Serv. Comm'n*, 461 F. Supp.2d at 1065.

**DISCUSSION**

I.   **Access to Entrance Facilities For Interconnection.**

Entrance facilities are dedicated transmission facilities that connect ILEC and CLEC networks. TRRO at ¶ 136; *USTA II* at 585. In the TRRO, the FCC made a national finding that CLECs are not impaired without access to entrance facilities and therefore that CLECs are not entitled to entrance facilities as UNEs under section 251(c)(3). TRRO at ¶¶ 136-41. Accordingly, with respect to entrance facilities, FCC rules provide that ILECs are "not obligated to provide a requesting carrier with unbundled access to dedicated transport that does not connect a pair of incumbent LEC wire centers." 47 C.F.R. § 51.319(e)(2)(i) (addressing "specific unbundling requirements").

AT&T characterizes the Arbitration Decision as requiring AT&T to do the very same thing that the FCC has expressly barred (providing CLECs with unbundled access to entrance facilities) by simply reclassifying the obligation as an interconnection duty as opposed to an unbundling duty. AT&T correctly notes that where the FCC finds that ILECs are not obligated to provide unbundled access to a given network element, a state commission may not craft an unbundling requirement for that same network element. *See McCarty*, 362 F.3d at 395 (quoting TRO at ¶ 195). AT&T therefore argues that the Arbitration Decision runs afoul of federal law inasmuch as it requires AT&T to provide CLECs with entrance facilities at TELRIC rates.

For their part, the Defendants argue that transmission facilities that connect ILEC and CLEC networks may be used for at least two different purposes, and that the Act specifically requires ILECs to provide CLECs with entrance facilities for one such purpose: interconnection. The Defendants argue that the FCC emphasized that point in the TRRO, which states that:

> We note in addition that our finding of non-impairment with respect to entrance facilities does not alter the right of [CLECs] to obtain interconnection facilities pursuant to section 251(c)(2) for the transmission and routing of telephone exchange service and exchange access service. Thus, [CLECs] will have access to these facilities at cost-based rates to the extent that they require them to interconnect with the [ILEC's] network.

TRRO at ¶ 140. Accordingly, defendants argue that the Arbitration Decision does not conflict with federal law because it provides that CLECs are entitled to entrance facilities at TELRIC rates only for the purpose of interconnection and not for any other purpose.

The only federal court to have addressed the question before this Court regarding access to entrance facilities for the purpose of interconnection held that "CLEC's are entitled to entrance facilities as needed for interconnection pursuant to § 251(c)(2), and that TELRIC is the appropriate rate for these facilities." *Missouri Pub. Serv. Comm'n*, 461 F. Supp.2d at 1065, 1073 (affirming the underlying arbitration order). In *Missouri Pub. Serv. Comm'n*, the court found that carriers can use entrance facilities for at least two distinct purposes: (1) to provide a final link in the dedicated transmission path between a CLEC's customer and the CLEC's switch, and (2) as interconnection facilities to exchange traffic between ILEC and CLEC switches. The court found that the first situation, known as "backhauling," does *not* make use of transmission facilities for interconnection purposes, but instead involves carrying traffic to and from a CLEC's own end users. The court found that the second situation makes use of the same physical transmission facilities for the purpose of interconnection – to provide a transmission path between the ILEC's switch and the CLEC's switch for the exchange of traffic between the two networks. The *Missouri Pub. Serv. Comm'n* court interpreted the TRRO as having reaffirmed the FCC's earlier determination in the TRO that "if a CLEC needs entrance facilities to interconnect with an ILEC's network (situation (2) above), the

10

CLEC has the right to obtain such facilities from the ILEC, at cost-based rates, under § 251(c)(2) of the Act." *Id.* at 1072 (citing TRRO at ¶ 140; TRO at ¶¶ 365-66).

AT&T does not attempt to distinguish *Missouri Pub. Serv. Comm'n*. Instead, AT&T relies upon *Illinois Bell Tel. Co. v. O'Connell-Diaz*, No. 05 C 1149, 2006 U.S. Dist. LEXIS 70221 (N.D. Ill. Sept. 28, 2006). In *O'Connell-Diaz*, the parties did not dispute that Illinois law required unbundling entrance facilities (among other things) in the face of the FCC's finding that ILECs cannot be required to unbundle entrance fees. The ICC argued that "irrespective of [the CLEC's] obligations under Section 251, [it] has an independent obligation to unbundle the elements in question [including entrance facilities] under a separate provision of the Act, *viz.*, Section 271." *Id.* at *35-36. The court held that the structure of the Act suggested Congress's intent to "separate Sections 251 and 252 from Section 271, as well as its intent to confine state authority to the former provisions." *Id.* at *39. As such, the ICC had no authority to enforce section 271. The court characterized the ICC's attempt to force unbundling of entrance facilities under section 271 as an attempt "to accomplish through indirect means what it is clearly prevented from doing directly." *Id.* at *40. AT&T argues that the same analysis applies here and that the ICC has done nothing more than impose an unlawful unbundling duty under another name.

In this case, the structure of the Act itself and the FCC's rules promulgated thereunder make clear that CLECs must be given access to entrance facilities to the extent CLECs require them for interconnection under section 251(c)(2) even though the FCC has determined that entrance facilities need not be unbundled under section 251(c)(3). As the FCC explained in the LCO:

> Section 251(c)(2) requires that interconnection be provided for "the transmission and routing of telephone exchange service and exchange access." Section 251(c)(3), in contrast, requires the provision of access to unbundled elements to allow requesting

11

> carriers to provide "a telecommunications service." The term "telecommunications service" by definition includes a broader range of services than the terms "telephone exchange service and exchange access." Subsection (c)(3), therefore, allows unbundled elements to be used for a broader range of services than subsection (c)(2) allows for interconnection.

LCO at ¶ 270. The Arbitration Decision does not require AT&T to lease entrance facilities as UNEs for the full range of uses permitted by section 251(c)(3) – nor could it given the FCC's determination that CLECs are not entitled to entrance facilities as UNEs under that subsection. Instead, the Arbitration Decision requires AT&T to make entrance facilities available for the sole purpose of interconnection under section 251(c)(2).

In arriving at its determination in the TRO that CLECs would no longer receive unbundled access to entrance facilities, the FCC recognized a functional distinction between the use of a particular facility to backhaul traffic and the use of that same facility for interconnection; the FCC found that the Act requires the facility to be made available when used for interconnection under section 251(c)(2) but does not require unbundling of the facility under section 251(c)(3) when used as an entrance facility for the purpose of backhauling traffic:

> Competitive LECs use . . . transmission connections between [ILEC] networks and their own networks [read: entrance facilities] *both for interconnection and to backhaul traffic*. Unlike the facilities that [ILECs] explicitly must make available for section 251(c)(2) interconnection, we find that the Act does not require [ILECs] to unbundle transmission facilities connecting [ILEC] networks to [CLEC] networks [read: entrance facilities] *for the purpose of backhauling traffic*.

TRO at ¶ 365 (emphases added). Because the FCC did not conduct an impairment analysis before concluding that the Act does not require ILECs to unbundle entrance facilities, the D.C. Circuit remanded for further consideration. *USTA II*, 359 F.3d at 586 (commenting that "[i]f entrance facilities are correctly classified as 'network elements,' an analysis of impairment would presumably

follow"). After conducting the required impairment analysis, the FCC again arrived at the same conclusion in the TRRO: because CLECs are not impaired without access to entrance facilities, the Act does not require them to be unbundled under section 251(c)(3). TRRO at ¶ 138. However, the FCC was clear that its finding of non-impairment under section 251(c)(3) did not alter the right of CLECs to obtain facilities necessary for interconnection under section 251(c)(2), under which subsection the duty of ILECs to provide interconnection at cost-based rates is absolute and does not depend upon a finding of impairment. *Id.* at ¶ 140.

AT&T urges a different interpretation of paragraph 140 of the TRRO. In that paragraph, AT&T argues, the FCC merely explained that CLECs still have a right to interconnection facilities under section 251(c)(2). AT&T argues that the use of the phrase "interconnection facilities" in paragraph 140 connotes those "facilities an ILEC must have ready to accommodate the connection to the CLEC's own facilities, and therefore does not include entrance facilities." (AT&T Mem. in Supt. of Mtn. for Summary Judgment at p. 7-8). In other words, AT&T argues that the TRRO only requires an ILEC to allow CLECs to interconnect with its network and does not require that the ILEC lease the interconnection facilities themselves to the CLECs.

This interpretation of paragraph 140 of the TRRO cannot be correct. "The FCC has interpreted 'interconnection' to mean 'the physical linking of two networks for the mutual exchange of traffic.'" *Missouri Pub. Serv. Comm'n*, 461 F. Supp.2d at 1065, 1072 (citing LCO at ¶ 176); *see also Competitive Telecommunications Ass'n v. FCC*, 117 F.3d 1068, 1072 (8th Cir. 1997) (addressing the interconnection duty in section 251(c)(2), "By its own terms, this reference is to a physical link between the equipment of the carrier seeking interconnection and the [ILEC's] network."). The FCC has recognized that transmission connections between ILEC networks and

13

CLEC networks – the definition of entrance facilities – can be used for the purpose of interconnection under 251(c)(2). TRO at ¶ 365. If it were the case that the same physical facility with respect to which the FCC found non-impairment under section 251(c)(3) could not also serve as an "interconnection facility," then there would have been no need for the FCC to emphasize in paragraph 140 of the TRRO that its "finding of non-impairment with respect to entrance facilities does not alter the right of [CLECs] to obtain interconnection facilities pursuant to § 251(c)(2)."

For these reasons, the Court finds that the Arbitration Decision should be affirmed to the extent it determined that CLECs are entitled to entrance facilities for the sole purpose of interconnection and that TELRIC is the appropriate rate for these facilities.[4] AT&T's motion for summary judgment is therefore denied with respect to the entrance facilities issue.

## II.    Applicability of the FCC's Rules on FTTH, FTTC, and Hybrid Loops.

The parties are also at odds with respect to the ICC's interpretation of the FCC's specific unbundling regulations for certain local loops, specifically, hybrid loops and fiber loops. "Administrative rules are subject to the same well-known maxims of construction as legislative statutes." *First Nat'l Bank of Chicago v. Standard Bank & Trust*, 172 F.3d 472, 476 (7th Cir. 1999) (citing *Alabama Tissue Ctr. v. Sullivan*, 974 F.2d 373, 379 (7th Cir. 1992)). "[I]n statutory construction cases, 'the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue, judicial inquiry into the statute's meaning, in all but the most

---

[4]The Act requires ILECs to provide interconnection facilities on rates, terms and conditions that comply with section 252 of the Act. 47 U.S.C. § 251(c)(2)(D). Section 252(d)(1) provides for a cost-based rate for the interconnection of facilities and equipment pursuant to section 251(c)(2). The FCC has established TELRIC as the methodology for implementing the cost-based rate provision in section 252(d)(1). The Arbitration Decision specifies that Section 252(c)(2)(D) contains all of the language necessary to establish the pricing standards for interconnection services.

extraordinary circumstances, is finished.'" *Id.* (citing *United States v. Kirschenbaum*, 156 F.3d 784, 789 (7th Cir. 1998)). This Court will "only look past the express language of a regulation when it is ambiguous or where a literal interpretation would lead to an 'absurd result or thwart the purpose of the overall statutory scheme.'" *Id.* at 477 (citing *United States v. Hayward*, 6 F.3d 1241, 1245 (7th Cir. 1993)).

A local loop is "a transmission facility between a distribution frame (or its equivalent) in an [ILEC] central office and the loop demarcation point at an end-user customer premises." 47 C.F.R. § 51.319(a). A hybrid loop is "a local loop composed of both fiber optic cable, usually in the feeder plant, and copper wire or cable." *Id.* at § 51.319(a)(2). The FCC's regulations describe two types of fiber loops. The first, a fiber-to-the-home ("FTTH") loop, is "a local loop consisting entirely of fiber optic cable, whether dark or lit, serving an end user's customer premises or, in the case of predominantly residential multiple dwelling units (MDUs), a fiber optic cable, whether dark or lit, that extends to the multiunit premises' minimum point of entry (MPOE)." *Id.* at § 51.319(a)(3)(i)(A). The second, a fiber-to-the-curb ("FTTC") loop, is "a local loop consisting of fiber optic cable connecting to a copper distribution plant that is not more than 500 feet from the customer's premises or, in the case of predominantly residential MDUs, not more than 500 feet from the MDU's MPOE." *Id.* at § 51.319(a)(3)(i)(B).

With respect to each of the loop types described above, the FCC's regulations place certain limits on ILECs' unbundling obligations under section 251(c)(3) of the Act. The regulations require unbundling of FTTC and FTTH loops only under limited circumstances. *See* 47 C.F.R. § 51.319(a)(3). With respect to hybrid loops, ILECs are not required to provide access to all of the functions of the loops. *Id.* at § 51.319(a)(2).

15

AT&T argues that the ICC erred when it changed the definitions of FTTH, FTTC and hybrid loops by adding language that limits applicability of the FCC's unbundling rules to those loops serving "mass market customers."[5] The ICC maintains that it so limited the applicability of the FCC's rules because portions of the TRO, the TRRO and other FCC pronouncements demonstrate that the FCC intended that its rules apply exclusively to those customers. This Court can find no ambiguity in the express language of the FCC regulations at issue. Further, the Court finds that a literal interpretation of those regulations will not lead to an absurd result nor thwart the purpose of the overall statutory scheme.

As AT&T points out, the FCC's rules on FTTH, FTTC, and hybrid loops, by their plain terms, are not limited to loops serving mass market customers. Instead, the FCC's rules define FTTH, FTTC, and hybrid loops in terms of the characteristics of the physical loops. The ICC does not argue that the language of the regulations is ambiguous. Instead, the ICC cites to provisions in the TRO that it asserts demonstrate the FCC's *intent* that its unbundling regulations for FTTH, FTTC, and hybrid loops would apply only to mass market customers. The ICC argues that the rules become ambiguous when read in conjunction with the FCC orders that adopted them. Essentially, this is an argument that the FCC's rules, interpreted literally, thwart the statutory scheme because they do not carry out the FCC's intent to limit ILEC's unbundling obligations only for mass market

---

[5]The FCC's regulations do not define "mass market customers" and the parties disagree on how that term should be defined. The FCC elsewhere defines "mass market customers" (essentially, residential and very small business customers) as those with fewer than 24 standard DS0 lines. TRRO at ¶ 226, n. 625. The Arbitration Decision defined mass market customers (as opposed to enterprise market customers, which are typically larger businesses) as those with fewer than 4 standard DS0 lines. Because the Court finds that the FCC's regulations should not be limited in their application to "mass market customers," there is no need for the Court to decide the question whether mass market customers, in this context, are those with fewer than 24 DS0 lines or those with fewer than 4 DS0 lines.

16

customers.

As already stated above, the language of the FCC's rules is not ambiguous and no mass market limitation appears therein. Nor does an examination of the FCC's orders for evidence of its intent in enacting the specific unbundling regulations at issue here indicate that the rules, as written, fail to carry out that intent. To be sure, the FCC intended that its rules would benefit the mass market by promoting the deployment of fiber – and with it, broadband services – to mass market customers. Indeed, the FCC specifically found that "in light of a competitive landscape in which [CLECs] are leading the deployment of FTTH, removing [ILEC] unbundling obligations on FTTH loops will promote their deployment of the network infrastructure necessary to provide broadband services to the mass market." TRO at ¶ 278. However, rather than require ILECs and CLECs to make market determinations with respect to each customer, the FCC determined that a customer-neutral approach that focused on the type of loops typically – but not exclusively – deployed to customers in the mass market would be sufficient to carry out its intent. *See* TRO at ¶ 197, n. 623 ("though our loop unbundling analysis focuses upon the customer classes most likely to be served by a specific type of loop, *the unbundling rules we adopt apply with equal force to every customer served by that loop type*.") (emphasis added); *see also id.* at ¶ 210 ("while *we adopt loop unbundling rules specific to each loop type*, our unbundling obligations and limitations for such loops *do not vary based on the customer to be served*.") (emphasis added).

The unbundling regulations at issue here – which limit ILEC's unbundling obligations with respect to certain loop *types* that are typically deployed to mass market customers – are not inconsistent with the FCC's intent to promote the deployment of broadband services to that market. Accordingly, because the FCC's regulations are unambiguous and admit of no limitation to mass

market customers, the ICC's Arbitration Decision, which limits applicability of those regulations to mass market customers, is inconsistent with and preempted by federal law. The Court therefore grants AT&T's motion for summary judgment with respect to that issue.

## CONCLUSION

For the reasons stated herein, AT&T's motion for summary judgment is granted in part and denied in part.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: September 21, 2007